# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF MASSACHUSETTS

In re

**EDWARD F. SIMPSON,**

                    **Debtor**

**Chapter 7**
**Case No. 02-11044-RS**

_____

**DONALD R. LASSMAN, TRUSTEE,**

                    **Plaintiff**

v.

**EDWARD F. SIMPSON et al.,**

                    **Defendants**

**Adversary Proceeding**
**No. 04-1214**

## MEMORANDUM OF DECISION AND ORDER ON
## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
## AND
## DEFENDANTS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT

In Count II of his second amended complaint, the plaintiff, Donald R. Lassman, as trustee in the chapter 7 case of Edward F. Simpson, asserts a cause of action 11 U.S.C. §544(b)(1) and § 4 of G.L. c. 109A, the Uniform Fraudulent Conveyance Act as applicable in Massachusetts prior to its amendment in 1996 ("UFCA § 4"), for three constructive fraudulent transfers in 1991 of his interests in certain Provincetown, Massachusetts real estate known as the Boatslip and Sandpiper properties. By cross-motions for summary judgment, both Lassman and the transferee defendants now seek summary judgment as to this cause of action. For the reasons set forth below, the Court will dismiss the constructive fraudulent transfer claims as to the July 1 transfers and deny both motions as to the October 30 transfer.

**PROCEDURAL HISTORY**

Edward F. Simpson ("Edward" or "the Debtor") filed a petition for relief under Chapter 7 of the Bankruptcy Code on February 13, 2002, thus commencing this bankruptcy case. William Billingham was appointed trustee in the case. By order of November 7, 2003, the Debtor was denied a discharge. Billingham, as chapter 7 trustee, commenced the present adversary proceeding on June 29, 2004, but passed away on August 15, 2005. On August 25, 2005, Donald Lassman was appointed successor trustee in the case and continues to serve in that capacity; as substitute trustee, he has replaced Billingham as the party plaintiff in this adversary proceeding.

By the second amended complaint herein, Lassman asserts seventeen counts for recovery of diverse assets that Edward allegedly fraudulently transferred, or for determination that the same assets are held by their owners—mostly trusts controlled by Edward's brother, John Peter Simpson ("Peter"), and his wife Joan Beard Simpson ("Joan")—in resulting or constructive trusts for the benefit of the Debtor. The Defendants include Peter, Joan, Peter's domestic partner James Carlino ("Carlino"), and numerous trusts and other entities through which they hold or have held title to the assets in question.

The present motions for summary judgment concern only Count II of the Second Amended Complaint, and Count II only insofar as it states a claim for constructive fraudulent transfer under § 4 of G.L. c. 109A, the Uniform Fraudulent Conveyance Act as applicable in Massachusetts prior to its amendment in 1996 ("UFCA § 4").[1] The same count was the subject of an earlier motion to dismiss on statute of limitations grounds. The Court denied that motion, holding that the statute of limitations issue was governed by the law in effect at the time of the

---

[1] Count II also states a claim under § 7 of the UFCA for an *actually* fraudulent transfer. The present motions concern only constructive fraud under § 4.

transfer and that if the governing statute were the UFCA, then the governing limitations period would be twenty years, and this count would survive.  The Court could not at that time ascertain from the complaint when the transfer occurred, and therefore made no final ruling on the limitations defense.  It is now clear that the three transfers in question occurred in 1991.  The defendants do not rely on the limitations defense in the present motions; nor do they argue that the matter should be governed by the any law but the UFCA.

Count II and the present motions concern three distinct transfers:  (i) the July 1991 transfer by Edward, as trustee of the Boatslip Investment Trust, of the Boatslip property to Peter, as trustee of the Boatslip Management Trust (of which Peter and Joan were fifty percent beneficiaries); (ii) the July 1991 transfer by Edward, as trustee of the Sandpiper Investment Trust, of the Sandpiper property to Peter, as trustee of the Sandpiper Management Trust (of which Peter and Joan were fifty percent beneficiaries); and (iii) the November 30, 1991 designation by Edward Simpson, in his individual capacity and pursuant to his authority under an agreement of November 21, 1991, of Peter and Joan as the parties to whom certain "Assets"—especially the mortgagee's mortgages on the Sandpiper properties—would be transferred upon payment in full of certain mortgage debt on the two properties.  Edward filed an opposition to the plaintiff's motion for summary judgment.  Peter, Joan, and Carlino filed a joint opposition to the same motion and jointly filed a cross motion for summary judgment, to which the plaintiff has filed an opposition.

## SUMMARY JUDGMENT STANDARD

A party is entitled to summary judgment only upon a showing that there is no genuine issue of material fact and that, on the uncontroverted facts, the movant is entitled to judgment as

3

a matter of law. FED. R. CIV. P. 56(c). Where the burden of proof at trial would fall on the party

seeking summary judgment, as it would here for the plaintiff chapter 7 trustee, that party must

support its motion with evidence—in the form of affidavits, admissions, depositions, answers to

interrogatories, and the like—as to each essential element of its cause of action. The evidence

must be such as would permit the movant at trial to withstand a motion for directed verdict under

FED. R. CIV. P. 50(a). *Anderson v Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). If the motion

is properly supported, the burden shifts to the adverse party to submit evidence demonstrating

the existence of a genuine issue as to at least one material fact. If the adverse party does not so

respond, "summary judgment, if appropriate, shall be entered against the adverse party." FED. R.

CIV. P. 56(e); *Jaroma v. Massey*, 873 F.2d 17, 20 (1st Cir. 1989).

Where the moving party would not bear the burden of proof at trial, the movant's initial

burden is to demonstrate or point out a lack of evidence to support at least one essential element

of the opposing party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986). The

burden then shifts to the opposing party to adduce such evidence on each of the disputed

elements as at trial would be sufficient to withstand a motion for directed verdict. *Anderson v*

*Liberty Lobby, Inc.*, *supra*. Summary judgment will enter for the movant if the party bearing the

burden of proof fails to establish the existence of an element essential to its case. *Celotex Corp.*

*v. Catrett*, 477 U.S. at 322-323; *In re Varrasso*, 37 F.3d 760, 763 n.1 (1st Cir. 1994).

### THE JULY 1991 TRANSFERS

As to the first two transfers—the July 1991 transfer by Edward Simpson, as trustee of the

Boatslip Investment Trust, of the Boatslip property and the July 1991 transfer by Edward

Simpson, as trustee of the Sandpiper Investment Trust, of the Sandpiper property—the plaintiff's

4

motion for summary judgment must be denied for failure of the plaintiff to satisfy a threshold requirement of 11 U.S.C. § 544(b)(1).  At the time of their transfer, the properties in question were owned not by the debtor but by trusts of which he was a trustee and a beneficiary.  To avoid these transfers, the chapter 7 trustee is relying on his powers under § 544(b)(1), under which a trustee in bankruptcy is empowered to avoid certain transfers and obligations that are avoidable under applicable law by certain creditors.  To be avoidable under § 544(b)(1), a transfer must be a transfer "of an interest *of the debtor* in property[.]"  11 U.S.C. § 544(b)(1) (emphasis added).  The transfers that are the subject of these first two properties are not, under the plaintiff's own allegations, assets of the debtor but of separate trusts.  Under the facts alleged, the debtor had no interest in the properties, only interests in the trusts that owned the properties.  The plaintiff has not argued that cause exists to disregard the separate existence of the trusts and to treat the debtor himself as the owner of the properties.  Therefore, the plaintiff has failed to establish a necessary element of his case as to these two transfers, and his motion for summary judgment must be denied as to them.

This particular difficulty in the plaintiff's case is not one of the bases on which the defendants seek summary judgment as to these transfers.  Still, in its present form, Count II fails to state a claim on which relief can be granted as to these transfers, and the Court will for that reason dismiss Count II insofar as it seeks recovery under a constructive fraudulent transfer theory for the July 1 transfers.

## THE NOVEMBER 30, 2001 TRANSFER

The sole remaining focus of the cross-motions for summary judgment is the third transfer:  the November 30, 1991 designation by Edward Simpson of Peter and Joan as the

parties to whom certain mortgage rights to the Boatslip and Sandpiper properties would be transferred upon payment in full of certain mortgage debt on the two properties.  The Trustee contends that this designation amounted to a transfer of an interests in the properties because

 a. under paragraph 7.1 and 7.2 of a certain Agreement of November 21, 1991, the signatories to that agreement gave Edward the right to designate the party to whom the mortgage rights would be transferred upon payment in full, without default, of certain mortgage debt;

 b. under his right of designation, Edward could have designated himself as the recipient of the mortgage rights, but instead he designated Peter and Joan;

 c. upon payment in full of the mortgage debt in 1996, the mortgage rights included title to the Sandpiper property, which title resulted from the Boatslip Trust's foreclosure by possession on the Sandpiper; and

 d. this title was subsequently transferred by the mortgagees to the defendants, who, before their sale of the Sandpiper in 2002, held title to the properties not by virtue of the July 1991 transfer but by virtue of the mortgagee's foreclosure and subsequent transfer of the properties for no additional consideration to the defendants.

**a.  Facts**

 The facts, though complex, are in large measure uncontroverted.  Subject to such issues of fact as are noted herein, the facts are as follows.

1.  **Concerning the Qualified Unsecured Creditor**

The alleged transfer occurred on November 30, 1991.  Following default on a loan

originally granted in 1989, First New Hampshire Banks Granite State ("First New Hampshire")

brought suit against Edward Simpson and others in 1990.  Summary judgment entered for First

New Hampshire on May 29, 1991.  Citizens Bank acquired the assets of First New Hampshire,

including this judgment, in September 1996.  The judgment remains unsatisfied.  Although First

New Hampshire obtained an attachment to secure this debt, it never obtained an execution.  The

Citizens/First New Hampshire judgment is an unsecured claim against the Debtor's bankruptcy

estate.

2.  **Concerning the Transfer**

On February 28, 1986, the debtor, Edward, as trustee of the Boatslip Investment Trust

("BIT"), purchased certain ocean-front real property in Provincetown, Massachusetts, known as

the Boatslip.  On the same day, Edward, as trustee of the Sandpiper Investment Trust, purchased

the abutting real property known as the Sandpiper.  By 1991, the Boatslip had been converted

into a 51- unit condominium, of which the BIT had sold eighteen units and continued to own

thirty-three.  The remaining thirty-three units, including a restaurant and bar, were managed for

the BIT by the Boatslip Management Corporation ("BMC"), of which Peter was president and

Carlino was treasurer.  Certain evidence indicates that Edward was sole owner of BMC, or the

ninety-nine percent owner, and other evidence that Peter and Carlino were the owners.  It is

uncontroverted, however, that the actual management of the Boatslip was conducted mostly by

Peter and Carlino and constituted their livelihood.

In the spring of 1991, Edward was insolvent and experiencing severe financial problems

that included the Boatslip and Sandpiper properties.[2]  The 33 retained units of the Boatslip had a

fair market value at that time of $2.69 million and were subject to the following liens:

1.      a purchase money first mortgage to Boatslip Associates Trust ("Associates"), on
        which was owed a balance of $2,000,000;

2.      a second mortgage to P&M Associates, Inc. ("P&M") on approximately half of
        the retained units, on which was owed a balance of $1,250,000

3.      a tax taking by the Town of Provincetown, for debt in the amount of $31,401.78;

4.      a third mortgage to Cape Cod Bank and Trust Company for $239,811.23;

5.      an attachment in favor of First New Hampshire Banks Granite State in the amount
        of $1,361,000; and

6.      an attachment in favor of P&M for $2,750,000.

The Sandpiper, which had a fair market value of $600,000, was subject to the following liens:

1.      a first position mortgage to Cape Cod Bank and Trust Company for $520,000.00;

2.      a second mortgage in favor of P&M in the amount of $300,000[3];

3.      a third position mortgage to Cape Cod Bank and Trust Company for $239,811.23;

4.      an attachment in favor of First New Hampshire Banks Granite State in the amount
        of $1,361,000; and

5.      an attachment in favor of P&M for $2,750,000.

Edward had personally guaranteed the P&M debts.  The P&M mortgage debts were in default,

and Edward faced a threat of foreclosure by P&M against both properties.

        All was not lost.  Peter had a good relationship with the principals of Associates, who

themselves had both an interest in averting a foreclosure by P&M (for its adverse tax

---

[2]  At all relevant times, Edward held at least 99 percent of the beneficial interest in both
the Boatslip Investment Trust and the Sandpiper Investment Trust.

[3]  This mortgage, though recorded first, was junior to the first mortgage of Cape Cod
Bank and Trust Company by virtue of a subordination agreement.

consequences) and a desire to see the Boatslip continue to be operated by Peter and James.  They expressed an interest in working with Edward and Peter to save the properties.

On or around May 16, 1991, Susan Daly, as trustee of Associates, made entry on each of the 33 remaining units of the Boatslip property for purposes of foreclosing its mortgage on the Boatslip by possession, and she recorded notice of such entry in the appropriate registry of deeds on June 7, 1991.  Having so taken possession of the properties, Associates entered into a management contract with Boatslip Management Corporation, effective May 16, 1991.  In the management contract, Associates retained BMC to manage the Boatslip until the end of the 1991 summer season, subject to further extensions.  The contract further dictated the disposition of all operating revenues of the Boatslip.

On July 1, 1991, Edward, as trustee of the Boatslip Investment Trust, transferred the Boatslip property to Peter, as trustee of the Boatslip Management Trust, of which Peter and Joan were both fifty percent beneficiaries.  The deed effectuating the transfer stated that the transfer was subject to the Associates mortgage "which the grantee by the acceptance of this deed assumes and agrees to pay."  Also on July 1, 1991, Edward, as trustee of the Sandpiper Investment Trust, transferred the Sandpiper property to Peter, as trustee of the Sandpiper Management Trust, of which Peter and Joan were both fifty percent beneficiaries.  Again, the deed effectuating the transfer stated that the transfer was subject to the Cape Cod Bank and Trust Company first mortgage and the P&M mortgage, "which the grantee by the acceptance of this deed assumes and agrees to pay."  The deeds were notarized by Joan.

Thereafter, Edward, Peter, and the principals of Associates, through Associates' attorney Marvin Geller, negotiated two agreements:  a purchase by three of the four principals of Associates, through a new trust known as the Boatslip Trust, of the P&M mortgages (including

related promissory notes and guarantees) against the Boatslip and Sandpiper properties for short

money, $250,000; and an agreement, executed on November 21, 1991, between (among others)

Boatslip Trust, Associates, Edward, Peter, and Boatslip Management Corporation (by both Peter

and Carlino) (the "November 21 Agreement").  Under the former, which was effectuated on or

around October 10, 1991, Boatslip Trust purchased from P&M its mortgages against the Boatslip

and Sandpiper properties for the total sum of $250,000.  Under the latter, Boatslip Trust agreed

to forbear from exercising its rights under the acquired mortgages, and to accept payment of

$260,000 plus interest over five years, in full satisfaction of the acquired mortgage debts.

Payments were to be interest only, with the full principal balance being due on the maturity date

of September 10, 1996.

Notably, the November 21 Agreement also contained the following Section 7, which

gave to Edward the right of designation that is the subject of the present count:

> 7.  <u>Transfer</u> <u>of</u> <u>Assets</u> <u>Upon</u> <u>Full</u> <u>Payment</u> <u>to</u> <u>the</u> <u>Trust</u>.
>
> 7.1  <u>Designation</u> <u>by</u> <u>Edward</u>.  In the absence of any default . . . *Edward*, by written instructions . . . which shall make specific reference to this Agreement, *shall designate the party (the "Designee") to whom the Assets shall be transferred following receipt by the Trust [Boatslip Trust] of full payment*.  Such instructions may be changed from time to time by written notice from Edward to the Trust's attorneys stated that the prior designation is revoked and setting forth the new designation.
>
> 7.2  <u>Transfer</u> <u>of</u> <u>Assets</u> <u>to</u> <u>Designee</u>.  On September 10, 1996, assuming there has been no default hereunder in the interim, the Trust will be paid $260,000 together with all accrued interest and Associates will be paid the $10,000 Balance together with all accrued interest.  Upon such payment and upon the receipt of a release in the standard form by Investment, Management, Cape Colony, Edward, Peter, Bostonian and Sandpiper in favor of both the Trust and Associates, *the Trust shall*, at the expense of the designee, *transfer the Asset documents to the Designee* and each of Investment, Management, Cape Colony, Edward, Peter, Bostonian and Sandpiper hereby assent to such transfer and, if requested by Trust, will execute at the time of the transfer a written consent to such transfer in form and substance acceptable to the Trust.

10

November 21 Agreement, § 7 (emphasis added).  The "Assets" to which these paragraphs refer

are defined in paragraph L of the November 21 Agreement to include the mortgages and related

promissory notes acquired by Boatslip Trust from P&M.  Under paragraphs 7.1 and 7.2 of the

November 21 Agreement, Edward was thus given (by Boatslip Trust, and with Peter's consent)

the right to designate who would receive the mortgage rights upon payment in full of certain

obligations.  The right of designation was unrestricted and included the right to designate

himself.

Instead he chose to assign the right to receive the Assets to Peter and Joan.  On

November 30, 1991, by letter to Marvin Geller, as attorney for Boatslip, which letter made

specific reference to paragraphs 7.1 and 7.2 of the November 21 Agreement, Edward designated

Peter and Joan as the recipients of the Assets.  "Please be advised that under the Agreement

dated November 21, 1991, I hereby relinquish any and all interest that I may have and assign

same to Peter Simpson and Joan Beard effective this date."  Edward never withdrew or altered

this designation.  The Defendants have neither alleged nor adduced evidence that they gave

consideration for this assignment.

On September 2, 1993, just a little over three years before the maturity date of the

November 21 Agreement, Boatslip Trust made entry on the Sandpiper for purposes of

foreclosing its mortgage on the Sandpiper by possession.  During the following three years, the

property continued to be owned, occupied, and operated by Peter, as trustee of the Sandpiper

Management Trust.  By letter and checks dated September 3, 1996, Peter and Carlino timely

made the last payment to the Boatslip Trust under the November 21 Agreement.[4]  By statute,

---

[4]  It is established and uncontroverted that the debt to Boatslip Trust under the November
21 Agreement was paid in full.  However, the final check itself is not in evidence; nor is there
evidence as to which trust, person, or entity actually paid this check or any of the other payments

however, Boatslip Trust's uninterrupted possession of the Sandpiper ripened into title on

September 2, 1996.   The right of redemption that until then had been held by Peter, as trustee of

the Sandpiper Management Trust, was extinguished.[5]   Nonetheless, the property continued to be

occupied and operated by Peter and James.

Title remained in Boatslip Trust until August 2000, when Boatslip Trust named Peter as

its successor trustee; and Peter, in that capacity, transferred the Sandpiper to himself (25%

undivided interest), Carlino (same), and Joan (50% undivided interest) as tenants in common for

nominal consideration.   This transfer was subject to the balance owing on the first mortgage to

Cape Cod Bank and Trust Company, which the transferees assumed.   In May 2002, Peter,

Carlino and Joan transferred the Sandpiper to an unrelated third party for $1,700,000.   These

facts are uncontroverted.


## c.  Discussion

The trustee's case requires proof of facts in three categories: those having to do with

standing under 11 U.S.C. § 544(b)(1); those having to do with the avoidability of the transfer § 4

of G.L. c. 109A, the Uniform Fraudulent Conveyance Act as applicable in Massachusetts prior to

its amendment in 1996 ("UFCA § 4"); and those having to do with the remedy under 11 U.S.C. §

550.

### a.  Qualified Unsecured Creditor

_____

to Boatslip Trust under the November 21 Agreement.

[5]  G.L. c. 244, § 1 ("A mortgagee may, after breach of condition of a mortgage of land,
recover possession of the land mortgaged by an open and peaceable entry thereon, if not opposed
by the mortgagor or other person claiming it, or by action under this chapter; and possession so
obtained, if continued peaceably for three years from the date of recording of the memorandum
or certificate as provided in section two, shall forever foreclose the right of redemption.").

Section 544(b)(1) states, in relevant part, that a trustee in bankruptcy "may avoid any transfer of an interest of the debtor in property . . . that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under § 502 of this title."  11 U.S.C. § 544(b)(1).  It permits the trustee to exercise avoidance rights that belong in the first instance to actual creditors.  In order to exercise this standing, the trustee must show that there exists an unsecured creditor that itself could bring the avoidance count that the trustee seeks to bring, a "qualified unsecured creditor."  UFCA § 4 can be invoked only by creditors who held claims against the debtor at the time of the transfer.  *In re Morse Tool, Inc.*, 148 B.R. 97, 131 (Bankr. D. Mass. 1992) ("UFCA § 4 limits standing to creditors whose claims against the debtor were in existence at the time the interest was transferred").  Therefore, the plaintiff trustee must show that the creditors of this bankruptcy estate include at least one unsecured creditor whose claim was in existence on November 30, 1991.

The plaintiff has adduced sufficient evidence to satisfy this requirement, and the defendants have not demonstrated the existence of a genuine issue of fact as to this requirement.  At the time of the transfer, First New Hampshire held a judgment against Edward that has not been satisfied.  Evidence has been submitted that Citizens Bank now owns the First New Hampshire judgment:  the averments of David E. Brown, a vice president of Citizens with responsibility for this account.  The defendants challenge the sufficiency of Mr. Brown's averments as to whether Citizens is now the owner of the judgment, but they have submitted no evidence to the contrary, and they do not dispute that a judgment entered in favor of First New Hampshire that has not been satisfied.  I deem the Brown affidavit to be sufficient evidence and

13

find that it is uncontroverted.[6]

The defendants argue that the Citizens claim was secured by an attachment at the time of the transfer and therefore cannot constitute the "unsecured claim" required by § 544(b)(1). The Court disagrees for two reasons. First, § 544(b)(1) requires that the claim be unsecured at the commencement of the bankruptcy case, not at the time of the transfer. Second, even at the time of the transfer, the First New Hampshire attachment was undisputedly and entirely "underwater." Section 506(a) of the Bankruptcy Code states that a claim secured by a lien is a "secured claim" to the extent of the value of the creditor's interest in the estate's interest in the collateral, and an "unsecured claim" to the extent that the claim exceeds such value. 11 U.S.C. § 506(a). By this definition, the First New Hampshire debt, though temporarily secured by an attachment, was always wholly "unsecured" for purposes of § 544(b)(1).

The defendants next argue that Edward's November 30 designation of Peter and Joan as recipients of the mortgage rights is not a transfer within the meaning of § 544(b). "Transfer" is a defined term that means "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, including retention of title as a security interest and foreclosure of the debtor's equity of redemption." 11 U.S.C. § 101(54) (prior to 2005 amendments).[7] The definition is broad and clearly encompasses the November 30 designation. Under the November 21 Agreement, Edward was given a right of designation that essentially gave him control over the disposition of the mortgage rights and,

---

[6] Moreover, even if the evidence were deemed insufficient, the plaintiff would still have satisfied the requirement of showing a qualified unsecured creditor because it is undisputed and uncontroverted that First New Hampshire held a claim at that time which remains unsatisfied..

[7] The definition of transfer was amended in 2005, but this bankruptcy case was commenced in 2002 and therefore in governed by the Bankruptcy Code as it existed prior to the amendments.

through them, of the Sandpiper.  The mortgage rights were available to him; instead, by his designation he assigned them to Peter and Joan.  The designation was a mode of disposing of an interest in property.  Moreover, the definition makes clear that a transfer is no less a transfer for being conditional or contingent.

The defendants also argue that the plaintiff should not be permitted to proceed under § 544(b) because Citizens and First New Hampshire would be barred by the doctrine of laches from prosecuting the action at this time.  Laches is an affirmative defense that requires a showing by the defendants that the plaintiff delayed unreasonably in commencing the action to the prejudice of the defendant.  The defendants have not carried their burden of adducing evidence of unreasonable delay because they have adduced no evidence that First New Hampshire or Citizens ever had actual notice, or could reasonably have learned, of the right to designate or of Edward's exercise of that right.  Absent knowledge of the November 21 Agreement, neither First New Hampshire nor Citizens could have known of the right to designate and of the control it gave the Debtor over disposition of the Sandpiper.

### b.  **Avoidance of the Transfer**

The trustee must also show that the transfer is actually avoidable by the qualified unsecured creditor.  Under the UFCA, the right of avoidance is set forth in section 9(1):

> Where a conveyance or obligation is fraudulent as to a creditor, such creditor, when his claim has matured, may, as against any person except a purchaser for fair consideration without knowledge of the fraud at the time of the purchase, or one who has derived title immediately or mediately from such a purchaser—
>
> > (a) Have the conveyance set aside or annulled to the extent necessary to set aside his or her claim[.]

G.L. c. 109A, § 9(1) (prior to 1996 amendments).  This right to avoid—in the language of the

15

statute, to "set aside" or "annul"—is in turn dependent on a showing that a particular transfer is "fraudulent as to [the] creditor."   To establish the fraudulence of the transfer as to the qualified unsecured creditor, the plaintiff relies on UFCA § 4, which (in relevant part) states:

> Every conveyance made . . . by a person who is . . . insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made . . . without a fair consideration.

G.L. c. 109A, § 4 (prior to 1996 amendments).  Under this section, actual intent is irrelevant. Fraudulence is defined constructively and requires that the trustee show only (i) that the debtor was insolvent at the time of the transfer—here the defendants concede insolvency—and (ii) that the transfer was made "without a fair consideration."  "Fair consideration" is itself a defined term:

> Fair consideration is given for property or obligation—
>
> (a) when in exchange for such property or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied.

G.L. c. 109A, § 3(a) (prior to 1996 amendments).  "A fair equivalent therefor" has been construed to require "at least a reasonable equivalence between the purchase price and the value of the property received."  *In re Morse Tool, Inc.*, 148 B.R. at 136; *In re O'Day Corporation*, 126 B.R. 370, 393 (Bankr. D. Mass. 1991).  The Court therefore must compare the value of what was transferred to the consideration received for it.

The defendants have adduced no evidence, and do not even allege, that they paid any sum to Edward for the rights conveyed by the designation.  They do allege that they gave consideration for the July 1 transfers of the Boatslip and Sandpiper properties, but the rights conveyed on November 30 were the rights of Boatslip Trust as mortgagee and therefore differed from the assets conveyed on July 1.  The plaintiff has established, without controversion, that no

16

consideration was given for the November 30 transfer.

The next issue is whether the transferred rights had appreciable value at the time of the transfer. As it turned out, the rights proved to be highly valuable. By virtue of the Boatslip Trust's foreclosure by possession of Sandpiper Management Trust's equity of redemption in the Sandpiper, the transferred mortgage rights matured into title to the Sandpiper. Moreover, because the Boatslip Trust mortgage (the mortgage acquired from P&M) had been paid in full and the foreclosure stripped the property of encumbrances junior to that mortgage, the title to which the assignees of the mortgage rights were entitled—which had a value in 2002 of $1.7 million—was encumbered only by the first mortgage in favor of Cape Cod Bank and Trust Company (the balance on which, as of September 1996, is not in evidence). Still, when determining whether fair consideration was given, the Court must evaluate value as of the time of the transfer and therefore in light of the various contingencies on which such value depended.

Ordinarily, the value of a fully paid promissory note and of the mortgage securing it is zero. The mortgagee has no further rights to payment and only an obligation to give and record a discharge. The extraordinary value in these particular mortgage rights was a factor of the value of the property, the extent of encumbrances that would remain upon ripening of title in the mortgagee, and two contingencies: (i) payment of the obligations to Boatslip Trust in full without default; and, despite such payment, (ii) Boatslip Trust's foreclosing by possession on the Sandpiper. How likely were these two contingencies to occur? The plaintiff has adduced considerable evidence that they were precisely what the parties to the November 21 Agreement contemplated when they entered into that agreement. Such evidence includes: (a) the existence of section 7 of the November 21 Agreement, a provision that would have made no sense without a plan of this nature; (b) the fact that Associates, under the direction of Attorney Geller, who also

17

represented Boatslip Trust and drafted the November 21 Agreement, had already made entry (for purposes of foreclosing) on the Boatslip, and that such entry did in fact mature into title in the mortgagee in 1994 despite continuing payments on the Associates mortgage until payment in full in 1996; and (c) the fact that Boatslip Trust, despite payment in full of the mortgage debt, did foreclose by possession on the Sandpiper.  It is not clear that there is evidence to the contrary. Still, value here is dependent on intent, and the determination of issues of intent on summary judgment is notoriously difficult and imprudent.  The Court may not weigh the evidence but must indulge every possible inference against the moving party.  If it is possible to conclude that these facts were mere coincidence and not evidence of intent designed to deliver title to the designee, the Court must deny summary judgment.  Because I cannot rule out that possibility, and therefore there remains a genuine issue of material fact as to whether the mortgage rights had appreciable value in 1991, the Court must deny the plaintiff's motion for summary judgment.

The defendants argue that summary judgment should be granted in their favor because, they argue, the transferred rights had no value over and above what the Debtor had already transferred to Peter and Joan through the Sandpiper Management Trust, the Sandpiper itself. The Court rejects this argument.  It is true that the ultimate value of the November 30 designation was in the proceeds thereof, title to the Sandpiper itself.  It is also true that the Sandpiper is precisely what had been transferred in one of the July 1 transfers.  But the November 30 transfer was not simply, in effect, a second deed as to one and the same transfer. Rather, the November 30 transfer would have value only if the Sandpiper Management Trust, as transferee of the Sandpiper under the July 1 transfer, lost its equity of redemption to the mortgagee by foreclosure.  Upon such loss (and assuming there was no default), the November

21 Agreement provided, the mortgagee would be obligated to transfer title to Edward's designee.

So the object transferred was not the same title as was conveyed in 1991.  Rather, what had been

transferred in 1991 would subsequently be lost to the mortgagee by foreclosure in 1996; by

virtue of the November 21 Agreement, Edward had control of the properties's disposition after

this foreclosure; and by virtue of the designation, Edward assigned the title to Peter and Joan.


### c. Remedy

Upon avoidance of the transfer, the plaintiff seeks here to recover not the property itself

but the value of the property.[8]  Although § 544(b)(1) permits a trustee to rely on "applicable law"

—here the UFCA—to avoid the transfer, the trustee's right of recovery, upon avoidance of the

transfer, is defined by the § 550 of the Bankruptcy Code itself:

> Except as otherwise provided in this section, to the extent that a
> transfer is avoided under section 544 . . . of this title, the trustee
> may recover, for the benefit of the estate, the property transferred,
> or, if the court so orders, the value of such property, from—
>
>> (1) the initial transferee of such transfer or the entity for
>> whose benefit such transfer was made; or
>>
>> (2) any immediate or mediate transferee of such initial
>> transfer.

11 U.S.C. § 550(a).  Provided the transfer is avoided, the trustee may therefore recover the value

of the property.  There is a dispute between the parties as to whether the value so recoverable is

the value at the time of the transfer or the value at the time of avoidance.  There is little authority

on the question.  I hold that the trustee should recover the value at the time of avoidance,

---

[8] The defendants have sold the property for $1.7 million to a third party who is not a
party to this action.

because, in view of inflation since 1991, nothing less will restore to creditors the value that was

taken from them at the time of the transfer.  The value of a 1991 dollar today, in 2007, is much

higher than a 2007 dollar.[9]  Only by awarding a recovery of full present value can the estate be

made whole for the 1991 transfer.  The defendants should, however, be credited for the value of

any liens that they paid after the property was transferred to them.

The defendants contend that no recovery may be had against them because they took the

property in good faith and without knowledge of the fraudulent nature of the conveyance.

Section 550(b) contains an affirmative defense for certain purchasers in good faith:

> The Trustee may not recover under section (a)(2) of this section
> from
>
> > (1) a transferee that takes for value, including satisfaction
> > or securing of a present or antecedent debt, in good faith,
> > and without knowledge of the voidability of the transfer
> > avoided; or
> >
> > (2) any immediate or mediate good faith transferee of such
> > transferee.

11 U.S.C. § 550(b).  This defense has two material limitations.  First, the defense does not apply

to recoveries under subsection 550(a)(1), from the initial transferee, but only to recoveries under

subsection (a)(2), from any immediate or mediate transferee of such initial transfer; here, Peter

and Joan are initial transferees; only Carlino, who took by transfer from Peter, is not.  For this

reason, the § 550(a) defense is not available to Peter and Joan.  Second, where the defense is

available, the defendant must prove that he or she, or a predecessor transferee, took not only (i)

in good faith and (ii) without knowledge of the voidability of the transfer but also (iii) for

---

[9] For like reason, the judgment of a 1991 creditor would accrue interest until it was
satisfied in 2007.

value.[10]   No defendant has alleged that value was given for the November 30 transfer.   For this

reason, the § 550(b) defense is not available to any defendant, even Carlino.   On the basis of

these limitations, the Court concludes that on the uncontroverted facts, this defense is not

available to the defendants and is not a basis either to defeat the plaintiff's motion for summary

judgment or to allow the defendants' cross-motion.

---

[10]   Good faith is a defense under the UFCA as well, but, again, only when paired with fair
consideration.   The power of avoidance in UFCA § 9(1) is not effective "as against any person
except a purchaser for fair consideration without knowledge of the fraud at the time of the
purchase, or one who has derived title immediately or mediately from such a purchaser."   G.L. c.
109A, § 9(1) (prior to 1996 amendments).

## ORDER

For the reasons set forth above, the Court hereby ORDERS as follows:

1.  as to the July 1 transfers, the Plaintiff's Motion for Partial Summary Judgment is denied; the Defendants' Cross-Motion for Summary Judgment is moot; and the Plaintiff's cause of action under UFCA § 4 is dismissed for failure to state a claim on which relief can be granted; and

2.  as to the October 30 transfer,

    a.  the Plaintiff's Motion for Partial Summary Judgment is denied,

    b.  the Defendants' Cross-Motion for Summary Judgment is denied; and

    c.  the Court deems established for purposes of trial the following:

        i.  the there exists a qualified unsecured creditor for purposes of 11 U.S.C. § 544(b)(1);

        ii.  that no consideration was given for the transfer; and

        iii.  that the defense under 11 U.S.C. § 550(b) is not available to the defendants.

Date:  December 17, 2007

_Robert Somma_
_____
Robert Somma
United States Bankruptcy Judge